## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

RUBY BROWN,              )

                       )

          **Plaintiff,**     )

                       )

                       )

**vs.**                    )     **CASE NO. 2:00-0116**

                       )     **JUDGE KNOWLES**

                       )

**RUSSELL STOVER CANDIES, INC.,**  )

                       )

          **Defendant.**    )

## MEMORANDUM OPINION

### I.  Introduction and Background

This matter is before the Court upon Defendant's "Renewed Motion for Summary Judgment," and Plaintiff's "Renewed Motion for Partial Summary Judgment."  Defendant has filed a supporting Memorandum and a Statement of Undisputed Material Facts.  Plaintiff has responded to the Statement of Undisputed Material Facts, and has filed a Response in Opposition to Defendant's Motion.  Plaintiff has also filed a supporting Memorandum and a Statement of Undisputed Material Facts.  Defendant has filed a Response to Plaintiff's Statement of Undisputed Material Facts as well as a Response in Opposition to Plaintiff's Motion.

Plaintiff filed her Complaint on December 26, 2000, alleging that Defendant had terminated her employment in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*, (the "ADA") and the Tennessee Human Rights Act, T.C.A. § 4-21-302 *et seq.* and

§ 8-50-103 (the "THRA").[1]  Plaintiff alleged in part that Defendant had violated the ADA and the THRA by terminating her employment on the basis of her real or perceived or reported disability, by failing to accommodate her disability, and by retaliating against her for asserting her rights under the ADA and THRA.  Plaintiff averred that she suffered from bilateral carpel tunnel syndrome, which "substantially limited major life activities."  She also averred that, despite her impairments, she could perform the essential functions of "several jobs within her classification of utility worker, with or without an accommodation."  Plaintiff averred that Defendant had changed her "job to packing cups on the packing line."  Plaintiff admitted, however, that "Plaintiff could not do this job without an accommodation."

On February 27, 2001, the parties filed a "Consent of the Parties" to have a United States Magistrate Judge conduct any and all further proceedings including the entry of judgment in this civil action.  Judge Haynes subsequently referred this matter to the undersigned.

On November 1, 2001, Defendant filed a Motion for Summary Judgment.  Also on November 1, 2001, Plaintiff filed a Motion for Partial Summary Judgment.  In her Motion for Partial Summary Judgment, and in her Response to Defendant's Motion for Summary Judgment, Plaintiff clearly abandoned her claim that she had suffered from an actual impairment that substantially limited a major life activity.  In fact, in her Memorandum in support of her Motion for Partial Summary Judgment, Plaintiff stated, "the parties apparently now agree that Plaintiff had no physical or mental impairment that substantially limited any major life activity at the time of her termination in January 2000."  Plaintiff argued, however, that Defendant mistakenly

---

[1]  The THRA is set forth in T.C.A. § 4-21-302 *et seq.*  Plaintiff cites T.C.A. § 8-50-103, apparently as part of the THRA.  That statute, however, is the Tennessee Handicap Act ("THA").  The Court will, therefore, consider Plaintiff's claims under both the THRA and the THA.

2

believed that Plaintiff was disabled within the meaning of the ADA. In these Motions for Summary Judgment, neither party addressed Plaintiff's claim of retaliation.

On September 6, 2002, the Court entered a Memorandum Opinion and Order denying Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Partial Summary Judgment. The Court stated in pertinent part as follows:

> Given the evidence presently before the Court, whether or not Plaintiff was actually or mistakenly perceived to be disabled, as well as the severity of Plaintiff's impairment, and the extent to which it may or may not affect her major life activities, are material issues on which reasonable juries could differ. As such, genuine issues of material fact exist.

(Footnote omitted.)

Following the Court's denial of the parties' Motions for Summary Judgment, the case was set for trial. The trial date, however, was continued several times because of the illness of a potential witness.

On June 17, 2005, the Court entered an Amended Joint Pretrial Order that had been submitted by the parties. That Order provides in pertinent part, "The pleadings are amended to conform to the Pretrial Order and the Pretrial Order supplants the pleadings." The Order also provides in pertinent part as follows:

> The parties agree that this is a "regarded as" case. The primary issue for determination of liability is whether [Defendant] terminated [Plaintiff's] employment because it incorrectly regarded her as substantially limited in the major life activity of working because of carpel tunnel syndrome.

Thus, in the Amended Joint Pretrial Order, Plaintiff abandoned her claims: (1) that she suffered from an actual impairment that substantially limited a major life activity, and (2) that Defendant retaliated against her for exercising her rights under the ADA and/or the THRA.

3

In the Amended Joint Pretrial Order, Plaintiff also listed the following as an "issue": "Whether [Defendant] made a blanket request for [Plaintiff's] medical records that was not limited to her arm and hand conditions in violation of the ADA." Defendant, in part, listed the following in its Statement of the Issues: "Whether the Court lacked subject matter jurisdiction for those claims and allegations of the plaintiff that go beyond the reasonable scope of the EEOC charge in this case."

On July 5, 2005, the Court held a Final Pretrial Conference, at which time the Court reopened the dispositive Motion deadline and gave the parties additional time to file further dispositive Motions.[2]

## II. Undisputed Facts

The following facts, except as otherwise noted, are undisputed.

### A. Plaintiff's Medical History

Plaintiff developed work-related bilateral carpel tunnel syndrome while working for a previous employer, Jeld-Wen. Plaintiff was treated for this condition by Dr. David S. Martin. In 1998, Plaintiff also had a condition which she described as "drawing up" of the ulnar digits, particularly of her right hand.[3] Dr. Martin recommended that she undergo right ulnar nerve transposition surgery and surgery for release of her right carpel tunnel. Plaintiff underwent those

---

[2] Although neither party has raised this issue, the fact that the Court has previously entered an Order denying both parties' Motions for Summary Judgment does not preclude another consideration of whether summary judgment is appropriate in this case. The Court's previous Order was not a final Order, and it is "subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties." *See* Fed. R. Civ. P. 54(b).

[3] The "ulnar digits" are the "pinkie" and "ring" fingers.

4

procedures on October 14, 1998.

On October 26, 1998, Dr. Martin noted, "She is making a smooth recovery and her numbness and tingling has completely resolved in her [right] hand." On February 1, 1999, Dr. Martin noted, "She has done beautifully and all of her symptoms of numbness, tingling, and aching have subsided." That same day, however, Dr. Martin recommended that Plaintiff undergo an open left carpel tunnel release for treatment of her left carpel tunnel syndrome. Plaintiff underwent that procedure on February 17, 1999.

On April 9, 1999, Dr. Martin noted, in part, that "[s]he continues to make excellent progress . . . ."

Plaintiff continued to improve until June 9, 1999, when Dr. Martin noted an enlarging subcutaneous mass along the volar axis of the left long finger, that he opined was wholly consistent with a ganglion of the tendon sheath. Plaintiff underwent surgery for that condition on June 30, 1999. On July 9, 1999, Dr. Brown noted that Plaintiff was "recovering well and voices no complaints."

On July 30, 1999, another doctor in Dr. Martin's office examined Plaintiff. He noted that Plaintiff "is healing well and has no difficulties at this time with the exception of some periodic soreness in her hand associated with use." He further noted, "I think we can release her to full duty without restrictions at this time."

Also on July 30, 1999, Dr. Martin prepared a "Final Evaluation and Impairment Rating," presumably for purposes of Plaintiff's workers compensation claim against her prior employer. Based upon the AMA guidelines, Dr. Martin related Plaintiff's injuries to her left upper extremity as equivalent to: "0% impairment of the hand which relates to a 0% impairment of the

5

upper extremity and 0% impairment of the person as a whole.

On January 19, 2000, Dr. Martin's Nurse Practitioner made the following entry in

Plaintiff's medical records:

> I had the pleasure of seeing Ms. Brown today in follow-up
> regarding some difficulties that she has been having in her left
> thumb and left elbow area.  The patient had previously been under
> our care for excision of a ganglion of the tendon sheath of her left
> long finger.  This was completed on 6-30-99.  We have not seen
> her since September of '99.  The patient reports that over the last
> several weeks she had noticed some "popping" in the proximal
> joint of her left thumb.  She reports that this is with certain
> opposition maneuvers.  She reports some occasional pain
> associated with this popping, but reports that this is rare at this
> time.  Also, the patient has noticed some tenderness along her left
> inner elbow area.  She also has complained of a "cold feeling" in
> her left long, ring, and little fingers.  She denies any numbness or
> tingling, however.  *She reports that these symptoms presented as
> she began to work at another company in Cookeville.
> Unfortunately, these symptoms caused her enough difficulty with
> this job that she was subsequently released.*

(Emphasis added.)

On February 11, 2000, Plaintiff again returned to Dr. Martin, who noted in part as

follows:

> Today, she has distinct tenderness along the course of the ulnar
> nerve at the cubital tunnel.  She has aching in her forearm and
> diminished two-point discrimination in the ulnar nerve
> distribution.  *Most interestingly, she does have some evidence of
> clawing on the left suggestive of significant ulnar nerve
> dysfunction.*  I have talked with her openly about this situation and
> recommended we perform a nerve conduction study/EMG.  If it is
> confirmatory for fairly advanced disease, she will probably benefit
> from an ulnar nerve transposition.  Because of her previous
> familiarity on the collateral arm, we have talked about this in some
> detail and she has knowledge of it.  She will see me back once
> nerve conduction testing has been completed or sooner if problems
> arise.

(Emphasis added.)

On March 6, 2000, Plaintiff again returned to Dr. Martin, and he wrote the following

note:

> Ms. Brown returns today to further discuss problems affecting her
> left upper extremity. She had previous right ulnar nerve
> transposition in October 1998, and last saw me on 2/11/00, with
> fairly pronounced left cubital tunnel syndrome. *She had clawing*
> *of her fingers and I referred her for nerve conduction testing.* I
> have discussed the results with Dr. Witt who could find no electro
> diagnostic evidence of nerve entrapment. Nonetheless, her clinical
> evaluation and symptoms continue to quite strongly suggest the
> presence of ulnar neuropathy at the elbow. She has a very
> sensitive ulnar nerve confined [_____][4] this location. Other sights
> of compression such as neck or guyon's canal are normal. Given
> the clawing which is present and the severe symptoms, I have
> recommended she undergo an ulnar nerve transposition. I have
> reminded her again of the potential complications and have
> tentatively scheduled her to undergo surgery on 4/3/00. She will
> call me in the meantime if questions or problems arise and may
> continue her usual work duties.

(Emphasis added, footnote added.)

On August 30, 1999, Plaintiff was examined by Dr. Robert P. Landsberg, presumably for

purposes of her workers compensation claim.[5] Dr. Landsberg's history states in part that, in

August 1998, "both hands started going numb and were drawing up." He further noted that, in

October 1998, Plaintiff "underwent right cubital tunnel surgery with ulnar nerve transposition,

and right open carpel tunnel release."

Dr. Landsberg's report also states in pertinent part as follows:

---

[4] Because of the quality of the copy, this word is illegible.

[5] Dr. Landsberg's report is in the form of a letter headed "Independent Medical
Examination" that was sent to the attorney representing Plaintiff in her workers compensation
lawsuit.

However, she continued with left carpel tunnel symptoms and was taken to surgery in February of 1999 where she had an open left carpel tunnel release. *Following that surgery her hands [sic] clenched up and her fingernails were digging into her palm and she had to go to physical therapy to get her fingers unclenched and get them moving again.*

. . .

[Following surgery in 1999 for the left middle finger ganglion] again she needed some physical therapy. *She had tightness in her fingers and is still left with some abnormality in the fingers where she can't fully actively extend them, and they are quite tight in the left hand.*

. . .

To appearance her right hand appears normal, *but the left hand is held in unusual posture with hyperextension at the MP joints, particularly of the little finger, ring finger and middle finger, and flexion at the PIP joints.* Actively, she can not eliminate this but passively this can be eliminated and then they can stay in that position because they kind of snap into place.

. . .

She has full range of motion actively in the elbow and wrist and fingers of the right, and good full range of motion in the left elbow and left wrist, and left thumb and index finger, but with *the intrinsic tightness as indicated in the other digits of the left hand.*

. . .

I feel that she should have permanent restrictions and limitations of no repetitive flexion and extension of her wrist [*sic*], no repetitive pounding with the palms of her hands or wrists. No repetitive gripping or squeezing with the left hand. I feel that this is within a reasonable degree of medical certainty.

(Emphasis added.)

### B. Plaintiff's Employment with Defendant

Plaintiff was hired by Defendant on either August 12, 1999, or August 13, 1999, as a

8

utility worker or as a "utility worker-packer."[6]  Defendant's written job analysis form for the position for which Plaintiff was hired included a requirement of "coordination of placing candy in wrapper and in designated area of prepared box."  Defendant's employee who interviewed Plaintiff on August 12, 1999, completed a document headed "Interview Form #2 Packing."  That form states in part as follows:

> This job requires sitting and/or standing for long periods of time, repetitive wrist motions, reaching, and working closely with others.  These are essential functions of the job.  Are you capable of performing these essential functions with or without accommodation?

The handwritten answer to this question is "w/o - 45 lbs."

During the approximately four months that Plaintiff worked for Defendant, she performed multiple job tasks within her job classification, including making display boxes, packing display boxes, candy pushing, and candy packing.  Plaintiff had no problem performing any of the job functions of her position, except for that of candy packing.  Plaintiff had a problem packing candy, however, because of "problems" with her left hand.

Sometime within the first month of her employment, Plaintiff was placed on the assembly line as a candy "packer."  With regard to the candy packing task, Plaintiff testified, "I wasn't there half a night.  I went to pushing. . . . *I couldn't keep up.  I couldn't keep – these fingers were locked up like this (indicating), because I had ulnar nerve damage in my left elbow and hadn't had surgery. . . ."*  (Emphasis added.)

On December 19, 1999, Plaintiff's then-supervisor assigned her to the candy packing

---

[6]  For purposes of the instant Motion, it is immaterial whether Plaintiff was hired on August 12 or on August 13, and it is further immaterial whether Plaintiff was hired as a "utility worker" or as a "utility worker-packer."

task. At some point, Plaintiff's supervisor approached Plaintiff and "complained because [Plaintiff] was missing a lot of boxes." At that point, Plaintiff showed the supervisor her left hand, "which had drawn up." Plaintiff advised the supervisor that she was "waiting on surgery on that but it had been cancelled . . . ." Plaintiff also told her supervisor that she had submitted some paperwork to another one of her supervisors, from Dr. Martin, concerning her upcoming surgery. Plaintiff also "probably" told her supervisor that she had restrictions from her doctor that did not allow her to do repetitive tasks with her left hand.

Following this conversation, Plaintiff's supervisor removed Plaintiff from the candy packing task and assigned her to the task of putting boxes on the line. About an hour and-a-half later, Plaintiff's supervisor sent her home, telling her that she needed to report to the personnel manager, Susan Beasley, the next day.

During her meeting with Susan Beasley the next day, Plaintiff told Ms. Beasley that she could do "everything in there except . . . [m]ove the paper cups and put the candy in." In her deposition, Plaintiff testified in part as follows concerning this conversation:

> Q. (By Mr. Williams) She just told you to do a job; is that right?
>
> A. Yes.
>
> Q. And you told her you couldn't do it?
>
> A. Correct.

Brown Dep., p 72.

Plaintiff also gave the following testimony relating to the first charge of discrimination she filed with the EEOC:

> Q. (By Mr. Williams) Now, in the next sentence you indicate

10

that you were placed in a packing position where you required an accommodation. What accommodation did that require?

A.    Well, I couldn't open my left hand.

Q.    So what did you think – what type of accommodation did you need for that task?

A.    Somebody to put my candy in my cups for me, I guess.

Q.    Could you do that job without being able to use your left hand?

A.    No. You had to put the cups in your left hand and your candy, pick it up and put it in the cup.

Q.    So the only accommodation that would allow you to actually pack that candy would be to have somebody do it for you?

A.    Correct.

Q.    So in other words, you couldn't do it?

A.    At that time, no, I could not, not full time.

*Id.*, p. 82-83.

Plaintiff further testified as follows:

Q.    (By Mr. Williams) Did you ever ask [Ms. Beasley] to restructure any of your job duties or tasks to accommodate you?

A.    I don't understand.

Q.    Did you ever ask Susan Beasley – did you ever say here's what I'd like to do?

A.    No.

Q.    Did you ever make any suggestions to her of what you felt like would be a reasonable accommodation for you to do

11

Q.    your job?

A.    No, I never told her.

. . .

Q.    You never made any suggestion to them of how they could restructure your job tasks or duties in order to keep you working?

A.    Outside of just not being able to pack at that time, no, I did not.

Q.    Outside – eliminating the packing task from your job description?

A.    Correct.

Q.    Other than that, that was fine, as far as you were concerned?

A.    Correct.  To the best of my knowledge, that was the only thing I was not able to do at that time.

*Id.*, p. 104-05.

During their meeting, Ms. Beasley asked Plaintiff to provide a written description of the job tasks she believed she was able to perform.  Ms. Beasley also requested that Plaintiff provide substantiating medical documentation.  Plaintiff complied on or about January 4, 2000, supplying Ms. Beasley with the requested written description of the job tasks she believed she was able to do.  Plaintiff wrote in pertinent part as follows:

During this time I have done the following with little or no problems:

. . .

7) Pack - while people do personal business.  I cannot pack due to the cup's [*sic*] and my left hand movement ability for long periods of time.

12

Plaintiff also supplied medical documentation obtained from her workers' compensation attorney, which included the clinical notes of Dr. Martin and the report prepared by Dr. Landsberg, discussed above. Defendant was unaware of the medical restrictions Dr. Landsberg had placed upon Plaintiff until it received this information.

Upon receiving the information from Plaintiff, Ms. Beasley instructed two employees, one of whom was the company Health and Safety Coordinator, to examine each job function performed by utility employees in every department in the plant to determine whether there was any job function which Plaintiff would be able to perform without violating Dr. Landsberg's restrictions. After observing the performance of every task in each department throughout the plant, these employees determined that there was only one job classification that would not violate Dr. Landsberg's restrictions, that of the weigh station job task in the enrobing department. The two positions within that job classification, however, were filled and protected by a seniority agreement pursuant to a Collective Bargaining Agreement. Defendant, therefore, determined that there were no available positions for Plaintiff that would not violate Dr. Landsberg's restrictions. Thus, Plaintiff's employment was terminated on January 14, 2000. Plaintiff's "Separation Notice," signed by Ms. Beasley, explains the circumstances of the separation as follows:

> Ms. Brown has a medical accommodation. We do not have a job opening where she can be accommodated. Last day worked 12/22/99.

Plaintiff subsequently filed a Complaint with the EEOC, alleging that she had been terminated in violation of the ADA and THRA. The EEOC subsequently determined that it was "unable to conclude that the information obtained establishes violations of the statutes," and

contemporaneously issued Plaintiff a right to sue notice.  Thereafter, Plaintiff filed the instant action.

### C.  The Cause of Plaintiff's Inability to Pack Candy

Plaintiff and Defendant both state, as an undisputed fact, that Plaintiff experienced difficulty with one or both *wrists* on December 22, 1999, and that her "wrist problem" caused her difficulty packing candy that evening.  There is, however, absolutely nothing in the record that has been cited by either Plaintiff or Defendant to support this statement.  In her Statement of Nondisputed Material Facts, Plaintiff cites the deposition of Elizabeth Arms at pages 56-58, for the allegedly undisputed fact that, "After being moved to the packing line on or about December 22, 1999, Ms. Brown began experiencing difficulties with her wrists."  Nothing on those pages supports that "fact."  Additionally, Plaintiff cites the deposition of Elizabeth Arms at pages 56-57 for the allegedly undisputed fact that, "On or about December 22, 1999, [Plaintiff] requested to be moved off packing because of her wrists, but Ms. Gantt refused."  Again, nothing on those pages of Ms. Arms' deposition supports that statement.

Defendant disputes both these allegedly undisputed facts but, in its Statement of Undisputed Material Facts, Defendant makes the following statement: "In December 1999 the Plaintiff asked her Supervisor to move her from her packing assignment because of medical problems relating to her wrists."  Docket No. 186, p. 4.  As the underlying citation for this alleged fact, Defendant cites the deposition of Ruby Brown at pages 57-59 and the deposition of Tammy Gantt at pages 46-47 and 49.  Once again, nothing on those pages of the depositions

14

supports that allegedly undisputed fact.[7]

The undisputed testimony in the record, from Plaintiff's own deposition, is that she could not pack candy on December 22, 1999, because of problems with certain fingers on her left hand that were "drawn up." As Plaintiff herself testified, and as her medical records confirm, the reason Plaintiff had a problem with the "clawing" of her left hand had nothing to do with her carpel tunnel syndrome. Instead, Plaintiff testified, "I couldn't keep – these fingers were locked up like this (indicating), because I had ulnar nerve damage in my left elbow and hadn't had surgery, and that was pending on finalization of Jeld-Wen's decision."

When Plaintiff had a left ulnar nerve transposition in approximately April 2000, that surgery resolved her problems, and she was "completely released" by Dr. Martin.

Presumably, Plaintiff wished to relate her bilateral carpel tunnel syndrome to her inability to perform the candy packing task that her job required, in the hope of establishing a prima facie case that she suffered from an actual impairment that substantially limited a major life activity. When Plaintiff abandoned that claim, however, and chose to proceed solely on the theory that she was "regarded as" disabled, Plaintiff probably no longer had any reason to make this argument.[8]

_____

[7] Plaintiff disputed that fact, however, citing the deposition of Plaintiff at page 57-58, noting "problems only to left hand." Docket No. 186, p. 4.

[8] It may be that Plaintiff wished to focus on the carpel tunnel syndrome because it is a more long-term or permanent condition than the problems she had with her left ulnar nerve. The EEOC regulations concerning the ADA provide in part that factors that should be considered in determining whether an individual is substantially limited in a major life activity include: (1) the duration or expected duration of the impairment; and (2) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. Plaintiff's left ulnar nerve problem was not permanent or long term, as it was resolved by surgery in the spring of 2000.

15

### III.  Summary Judgment Standards

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  To prevail, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim.  *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 202 (1986); *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  In determining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the non-moving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  If a non-moving party, however, fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23.  When this occurs, the moving party is entitled to summary

---

Why Defendant ever sought to establish, as an undisputed fact, that "Plaintiff asked her supervisor to move her from her packing assignment because of medical problems relating to her wrists," is unclear to the Court.

16

judgment as a matter of law.  *Id.* at 322-23; *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38
(6th Cir. 1999).

## IV.  Plaintiff's ADA Claims

The Sixth Circuit has, on several occasions, set forth the appropriate framework for an
analysis of ADA claims.  *See, e.g., EEOC v. Daimler Chrysler Corp.*, 2004 U.S. App. LEXIS
20422 (filed September 15, 2004); *Cannon v. Levi Strauss & Co.*, 2002 U.S. App. LEXIS 2093
(filed February 6, 2002); *McKay v. Toyota Motor Manufacturing, USA, Inc.,* 110 F.3d 369 (6th
Cir. 1997).  That framework can be summarized as follows.

The ADA prohibits an employer from discriminating "against a qualified individual with
a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  A person
seeking relief under the ADA for termination must establish: (1) that she is a disabled person
within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her
job with or without reasonable accommodation, and (3) that she suffered an adverse employment
decision because of her disability.  *McKay v. Toyota,* 110 F.3d at 371.

The ADA limits its protection to those who are "disabled."  *Cannon v. Levi Strauss &
Co.,* 2002 U.S. App. LEXIS at **8.   "Disability" is defined in the ADA as: "(A) a physical or
mental impairment that substantially limits one or more of the major life activities of such
individual; (B) a record of such an impairment; or (C) being regarded as having such an
impairment."  42 U.S.C. § 12102(2).

As discussed above, Plaintiff originally alleged that she was disabled (1) because she had
a physical or mental impairment that substantially limited a major life activity, and (2) because
she was regarded by Defendant as having such an impairment.  Plaintiff has, however,

17

abandoned the claim that she had a physical or mental impairment that substantially limited a

major life activity.  Thus, Plaintiff's only claim is that she was "regarded as" disabled by

Defendant.[9]

The United States Supreme Court discussed the "regarded as" disabled provision of the

ADA in *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999).  The Court stated in pertinent part

as follows:

> There are two apparent ways in which individuals may fall within
> [the statutory definition of being regarded as having an
> impairment]: (1) a covered entity mistakenly believes that a person
> has a physical impairment that substantially limits one or more
> major life activities, or (2) a covered entity mistakenly believes
> that an actual, non-limiting impairment substantially limits one or
> more major life activities.  In both cases, it is necessary that a
> covered entity entertain misperceptions about the individual – it
> must believe either that one has a substantially limiting impairment
> that one does not have or that one has a substantially limiting
> impairment when, in fact, the impairment is not so limiting.  These
> misperceptions often "result from stereotypic assumptions not truly
> indicative of . . . individual ability."

527 U.S. at 489.

*Sutton* is also instructive in its discussion of the ADA terms "major life activity" and

"substantially limited."  As the Sixth Circuit stated in *Cannon v. Levi Strauss*, 2002 U.S. App.

LEXIS at **10:

> *Sutton* assumed without deciding that working is indeed a major
> life activity and found that to be substantially limited from
> working a plaintiff must allege that she is unable to work in a

---

[9]  In the Joint Pretrial Order, submitted to the Court shortly before this case was
scheduled for trial in July 2005, Plaintiff apparently attempted to raise an entirely new claim that
Defendant is somehow liable to Plaintiff under the ADA because Defendant made an overbroad
request for Plaintiff's medical records.  As will be discussed below, that claim is not properly
part of this lawsuit, but even if it were, it is without merit.

"broad class of jobs."[10] . . . The EEOC regulations on this subject are in accord with that definition, and they suggest that several factors are to be considered when determining if an individual is substantially limited in the activity of working: the geographical area in which the person may obtain employment and the number and type of jobs in that area using similar training, knowledge, and skills.

. . .

Being unable to do a single, particular job does not rise to [the level of being "substantially limited" in the major life activity of working].

*Id*. at **10 (citations omitted, footnote added).

The Supreme Court also said in *Sutton*:

To be substantially limited to the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

527 U.S. at 492.

The Supreme Court further discussed the concept of substantially limiting a major life activity in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). In *Williams*, Plaintiff was an assembly line worker for Defendant, working with pneumatic tools. She eventually developed pain in her hands, wrists, and arms, and she was diagnosed with bilateral carpel tunnel syndrome and bilateral tendinitis. She was ultimately terminated by Defendant. Defendant claimed that she was terminated because of poor attendance. Plaintiff claimed that

---

[10] The Sixth Circuit apparently has held, after the Supreme Court's decision in *Sutton*, that working is a major life activity. *Mayhon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002) *citing Henderson v. Ardco, Inc.,* 247 F.3d 645, 652 (6th Cir. 2001).

she was terminated in violation of the ADA.  After discussing the EEOC regulations and their

definition of "substantially limited," the dictionary definition of "substantial," and the dictionary

definition of the term "major," the *Williams* court stated in pertinent part as follows:

> *That these terms need to be interpreted strictly to create a*
> *demanding standard for qualifying as disabled is confirmed by the*
> *first section of the ADA, which lays out the legislative findings and*
> *purposes that motivate the Act. . . .*  When it enacted the ADA in
> 1990, Congress found that "some 43 million Americans have one
> or more physical or mental disabilities." . . .  If Congress intended
> everyone with a physical impairment that precluded the
> performance of some isolated, unimportant, or particularly difficult
> manual task to qualify as disabled, the number of disabled
> Americans would surely have been much higher.
>
> . . .
>
> We therefore hold that to be substantially limited in performing
> manual tasks, an individual must have an impairment that prevents
> or severely restricts the individual from doing activities that are of
> central importance to most people's daily lives.
>
> . . .
>
> It is insufficient for individuals attempting to prove disability
> status under this test to merely submit evidence of a medical
> diagnosis of an impairment.  Instead, the ADA requires those
> "claiming the Act's protection . . . to prove a disability by offering
> evidence that the extent of the limitation [caused by their
> impairment] in terms of their own experience . . . is substantial." . .
> .  That the Act defines "disability" "with respect to an individual,"
> 42 U.S.C. § 12102(2), makes clear that Congress intended the
> existence of a disability to be determined in such a case-by-case
> manner.
>
> . . .
>
> An individualized assessment of the effect of an impairment is
> particularly necessary when the impairment is one whose
> symptoms vary widely from person to person.  Carpel tunnel
> syndrome, one of respondent's impairments, is just such a
> condition.

534 U.S. at 197-99 (citations omitted, emphasis added).

Even before the *Williams* Court's statement regarding strict interpretation of certain

definitions in the ADA, the Sixth Circuit had recognized the difficulty a plaintiff has in proving a

"regarded as" disabled case:

> Proving that an employee is regard as disabled in the major life activity
> working takes a plaintiff to the farthest reaches of the ADA. It is a
> question embedded almost entirely in the employer's subjective state of
> mind. Thus, proving the case becomes extraordinarily difficult. Not only
> must a plaintiff demonstrate that an employer thought he was disabled, he
> must also show that the employer thought that his disability would prevent
> him from performing a broad class of jobs. As it is safe to assume
> employers do not regularly consider the panoply of other jobs their
> employees could perform, and certainly do not create direct evidence of
> such considerations, the Plaintiff's task becomes even more difficult. Yet
> the drafters of the ADA and its subsequent interpretive regulations clearly
> intended that plaintiffs who are mistakenly regarded as being unable to
> work have a cause of action under the statute.

*Ross v. Campbell Soup Company*, 237 F.3d 701, 709 (6th Cir. 2001).

In discussing the foregoing language from *Ross*, the Sixth Circuit subsequently stated as

follows:

> The EEOC contends that an ADA claimant alleging that he was "regarded
> as" substantially limited in his capacity for "work" need only show that
> "the limitations the employer subjectively perceived the individual as
> having would, if true, significantly restrict the individual's ability to do a
> class or broad range of jobs."
>                                     . . .
>
> This position is contrary to the law in this circuit and other circuits,
> which requires an ADA claimant to demonstrate that the employer
> thought that the perceived limitation would *prevent* the claimant
> from performing a class of broad range of jobs.
>
>                                     . . .
>
> *We must apply this standard even in the presence of criticism by*
> *the EEOC and academics that the standard makes it "virtually*

21

> *impossible" for a claimant to sustain a "regarded as" claim of the "working" stripe.*

*EEOC v. Daimler Chrysler*, 2004 U.S. App. LEXIS at **20 n.6 (citations omitted, emphasis added).

Moreover, in a case involving the impairment of carpel tunnel syndrome, where Plaintiff argued that Defendant had regarded her as unable to perform a broad class of jobs involving repetitive motion, the Sixth Circuit has stated in part as follows:

> [In *McKay v. Toyota Motor Mfg., USA, Inc*., 110 F.3d 369, 373 (6th Cir. 1977)] this court specifically held that a person unable to do repetitive motion factory work was not prohibited from a broad class of jobs and thus was not disabled for purposes of the ADA.
> . . .
>
> *Repetitive motion factory work is simply not a broad class of jobs.*

*Cannon v. Levi Strauss*, 2002 U.S. App. LEXIS at **14 (emphasis added).

### A. Was Plaintiff "Regarded as" Disabled?

Applying these principals to the undisputed facts of the case at bar, it is clear that Plaintiff cannot prove a prima facie case that she was "regarded as" disabled for several reasons.

First, as discussed above, Plaintiff must show either: (1) that Defendant mistakenly thought she had an impairment that she did not have, or (2) that Defendant mistakenly believed an impairment she did have was substantially limiting when, in fact, it was not. There is no question that Plaintiff had bilateral carpel tunnel syndrome and "clawing" of certain fingers of her left hand, and that Defendant knew she had these conditions before it terminated her. Thus, Defendant did not mistakenly believe that Plaintiff had a condition or impairment that she did not have. The only way for Plaintiff to recover, therefore, would be to show that Defendant mistakenly thought her impairment (or impairments) substantially limited her in the major life

activity of working. Plaintiff has come forward with no evidence, however, to show that Defendant believed this, at or before the time she was terminated, mistakenly or otherwise.

It is undisputed that Dr. Landsberg stated, in his written medical report as follows:

> I feel she should have permanent restrictions and limitations of no repetitive flexation and extension of her wrist, no repetitive pounding with the palms of her hands or wrists. No repetitive gripping or squeezing with the left hand. I feel that this is within a reasonable degree of medical certainty.

Defendant knew of these restrictions prior to Plaintiff's termination and examined each task performed by utility workers on the east wall hearts line where Plaintiff was working. Defendant found no job function that Plaintiff could perform without violating Dr. Landsberg's restrictions. Thus, Defendant did not view Plaintiff through stereotypes, based on her impairment, but rather followed the specific recommendations of her physician.[11] The Sixth Circuit specifically approved this approach in *Cannon v. Levi Strauss & Co.,* 2002 U.S. App. LEXIS at **16 (noting that the Supreme Court referred to this course as "the correct one" in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, (2002)).

In responding to Defendant's argument, Plaintiff first claims that Defendant mistakenly believed that Plaintiff could not perform her own job. Given the undisputed fact that Plaintiff told her supervisor that she could not perform the task she was assigned to do (candy packing), which Plaintiff admitted was one of the tasks encompassed in her utility worker-packer job

---

[11] Plaintiff argues that Defendant should not have relied upon the findings of Dr. Landsberg, who merely examined Plaintiff, but instead should have relied upon the findings of her treating physician, Dr. Martin. Plaintiff, however, offers no logical basis for this argument. Additionally, the Court notes that Dr. Martin's final impairment rating of Plaintiff was completed on July 30, 1999, while Dr. Landsberg's examination and report were done approximately a month later on August 31, 1999. The Court concludes that Defendant clearly had the right to rely upon the later report and restrictions imposed by Dr. Landsberg.

23

description, Plaintiff's argument here simply has no factual support. Even if it did, however, and assuming Defendant somehow mistakenly believed that Plaintiff could not perform essential functions of her own job, that fact would not establish that Defendant mistakenly believed Plaintiff was precluded from performing a broad class of jobs.

Second, Plaintiff argues that Defendant knew Plaintiff was unable to perform virtually all the other jobs in the plant, and that Defendant, therefore, considered her to be restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. But, as the Sixth Circuit stated in *Cannon v. Levi Strauss, supra*, repetitive motion factory work is simply not a broad class of jobs. Even if it were, however, it is not sufficient for Plaintiff to show simply that Defendant believed Plaintiff was precluded from performing a class of jobs or a broad range of jobs in various classes; instead, Plaintiff must show that Defendant *mistakenly* believed that Plaintiff was unable to perform a broad range of jobs or a class of jobs. Plaintiff has not done do.

Third, Plaintiff contends that Defendant's own expert has essentially established the proposition that Plaintiff was precluded from performing a number of jobs. The short answer to this argument, however, is that this testimony was given by Plaintiff's hired expert witness long after Plaintiff was terminated and after this lawsuit was filed. It has absolutely nothing to do with showing what Defendant may or may not have believed at the time it made the decision to terminate Plaintiff. *See EEOC v. Daimler Chrysler Corp.*, 2004 U.S. App. LEXIS at **24-25 (noting that the record did not reflect that Defendant's employment supervisor or its operating management, who made the decision not to hire Plaintiff, possessed the level of knowledge of Defendant's subsequently-hired expert witness). Additionally, as discussed above, even if

24

Defendant believed that Plaintiff was unable to perform a class of jobs or a broad range of jobs in various classes, Plaintiff again has not shown that Defendant mistakenly believed this.

Plaintiff further argues that Defendant regarded her as disabled because it listed her as "disabled" in a computer printout that was prepared after Defendant was terminated. Once again, however, what Defendant may or may not have thought about Plaintiff's "disability" after she was terminated simply cannot support Plaintiff's claims under the ADA.

Plaintiff also argues that Defendant regarded her as disabled because Defendant stated, in filings before the EEOC, that Plaintiff was "ADA qualified." Plaintiff, however, makes no attempt to explain the meaning of the term "ADA qualified," and there is no indication in the record that "ADA qualified" is the equivalent of "regarded as" disabled. Moreover, as with the above arguments, Plaintiff is attempting to rely upon something that occurred long after she was terminated to show that Defendant regarded her as disabled when she was terminated.

Plaintiff relies upon the recent Sixth Circuit Case of *Moorer v. Baptist Memorial Healthcare System,* 398 F.2d 469 (6th Cir. 2005) to support her argument that Defendant must have recognized that Plaintiff's impairment would have precluded her from performing a broad class of jobs. *Moorer*, however, was an appeal from a district court's ruling in favor of a plaintiff, following a bench trial in a "regarded as" disabled case. As the *Moorer* Court noted, "we review the district court's findings of fact for clear error." 398 F.2d at 478. Thus, in *Moorer*, the Sixth Circuit determined only that the trial court's factual finding that defendant recognized that plaintiff's impairment of alcoholism would have precluded him from performing a broad class of jobs was not clear error.

Moreover, in *Moorer*, the district court obviously made a determination that plaintiff had

proven a prima facie case. Plaintiff, in the case at bar, however, has not done so, as discussed above.

Finally, in *Moorer,* the impairment at issue was alcoholism. In the case at bar, the impairment at issue is either Plaintiff's bilateral carpel tunnel syndrome or Plaintiff's left ulnar nerve problems, which, according to Dr. Landsberg, restricted Plaintiff's ability to do repetitive motion factory work. As the *Cannon* court stated, however, repetitive motion factory work does not constitute a broad class of jobs.

For the foregoing reasons, Plaintiff cannot establish a prima facie case that she was "regarded as" having an actual impairment under the ADA.

### B. Was Plaintiff qualified to perform the essential functions of her job?

Even if Plaintiff could establish a prima facie case that she was regarded as disabled, she would also have to establish that she was "qualified to perform the essential functions of her job. . . . ." *McKay v. Toyota, supra,* 110 F.3d at 371. In a case involving an actual impairment that substantially limits a major life activity, a plaintiff can show that she was qualified to perform the essential functions of her job either with or without reasonable accommodation. *Id.* The Sixth Circuit has held, however, that, in a "regarded as" disabled case, a defendant has no obligation to reasonably accommodate the employee. *Workman v. Frito-Lay, Inc.,* 165 F.3d 460, 467 (6th Cir. 1999). Thus, in the case at bar, Plaintiff must show that she was qualified to perform the essential functions of her job without reasonable accommodation.

Plaintiff's own deposition testimony plainly shows that she was not qualified to perform essential functions of her job without accommodation. She was removed from the task of candy packing after she told her supervisor that she could not do that job.

26

Even if Plaintiff were entitled to "reasonable accommodation," she admitted in her deposition that the only "accommodation" that Plaintiff could have made for her would have been to have another employee do her job, something that she admittedly (and understandably) never asked for. That "accommodation" clearly is not a "reasonable accommodation" under the ADA. Thus, Plaintiff cannot state a prima facie case that she was qualified to perform the essential functions of her job.

## V. Plaintiff's State Law Claims

In their pending Motions for Summary Judgment, the parties do not differentiate between Plaintiff's claims under the ADA and Plaintiff's claims under the THRA, and neither party argues that the Court's analysis of Plaintiff's claims under these two Acts should be different.

In *Barnes v. The Goodyear Tire and Rubber Co.,* 48 S.W.3d 698 (Tenn. 2000), the Tennessee Supreme Court discussed the relationship between the Tennessee Handicap Act ("THA") and the ADA. The Court stated in pertinent part:

> The THA embodies the definitions and remedies provided by the Tennessee Human Rights Act . . . . The legislature's stated purpose in codifying the THRA was to prohibit discrimination in a manner consistent with "the Federal Civil Rights Acts of 1964, 1968, and 1972, . . ." *Tenn. Code Ann.* § 4-21-101(a)(1), -101(a)(2). We, therefore, may look to federal law for guidance in enforcing our own anti-discrimination laws.

48 S.W.3d at 705.

Moreover, *Barnes* recognized that the THRA defines the term "handicap" in essentially the same manner as the ADA, and that the THRA's definition of handicap includes individuals "regarded as" having an impairment which substantially limits a major life activity. *Id.* at 706. Additionally, *Barnes* cited *Sutton v. United Airlines, supra,* in discussing the definition of

27

"regarded as disabled."

Thus, because Plaintiff cannot establish a prima facie case under the ADA, Plaintiff similarly cannot establish a prima facie case under the THA or the THRA.

## VI.  Plaintiff's Motion For Summary Judgment

As discussed above, Plaintiff has also filed a Motion for Partial Summary Judgment. Most of the arguments made therein mirror Defendant's arguments discussed above.  Plaintiff has, however, raised two additional arguments that the Court will address below.

First, Plaintiff argues that the reasons given by Defendant for Plaintiff's termination are false and pretextual.  But the Court does not reach the issue of pretext unless Plaintiff can first establish a prima facie case, which she has not done.

Second, Plaintiff raises an argument that Defendant's request that Plaintiff produce "all medical records related to [her] current medical condition," violated the ADA's prohibition on requesting unrelated medical information.  Plaintiff apparently seeks a judgment that Defendant is liable to her under the ADA.  The Court concludes that Plaintiff has not properly raised this issue for several reasons.

As discussed above, however, Plaintiff never raised this claim in her Complaint.  Instead, Plaintiff simply listed this as an issue in the Joint Amended Pretrial Order that was entered on June 17, 2005.  Although Defendant did not specifically object to Plaintiff's stating this matter as an issue, Defendant did object to the Court exercising jurisdiction over matters that were not properly presented to the EEOC.  Plaintiff never raised this issue before the EEOC.  That being the case, she cannot raise it in this Court.

Even if Plaintiff could raise the issue, however, it is without merit.  Plaintiff's argument

that Defendant requested "unrelated" medical information simply has no factual support.  The

letter dated December 27, 1999, from Ms. Beasley to Plaintiff states in pertinent part as follows:

> In addition to your input regarding accommodation, we will also
> need additional medical information.  It is not currently necessary
> for you to undergo a new medical evaluation for this purpose.  We
> have enclosed letters you must use to ask your physicians and
> other healthcare providers *from whom you have sought treatment*
> *for the medical condition for which you seek accommodation* to
> send a photocopy of your medical record.

The enclosed form letters to the physicians state in pertinent part as follows:

> Dear Dr.              :
>
> I need your assistance to help my employer understand enough
> about my medical condition to provide me with reasonable
> accommodation if medically necessary.  *For this purpose, my*
> *employer requires that I submit a photocopy of my medical records*
> *related to my present medical condition.* . . .

It is crystal clear that Defendant sought from Plaintiff only medical records related to

"the medical condition for which [Plaintiff sought] accommodation."

Furthermore, Plaintiff has cited no provision of the ADA that prohibits Defendant from

asking for her medical records.  As authority for this proposition, Plaintiff cites only two

provisions of a document headed "EEOC Enforcement Guidance on Disability Related Inquiries

and Medical Examinations."

Finally, Plaintiff has not alleged that she was damaged by Defendant's request.  Plaintiff

never alleges (or establishes) that she actually supplied any medical records that were

"unrelated" to her bilateral carpel tunnel syndrome or to her ulnar nerve problems.

## VI. Conclusion

For the foregoing reasons, Defendant's Renewed Motion for Summary Judgment will be GRANTED, the Court finding that there are no genuine issues as to material fact and that Defendant is entitled to a judgment as a matter of law.  Likewise, for the foregoing reasons, Plaintiff's Renewed Motion for Partial Summary Judgment will be DENIED.

An appropriate Order will be entered.

E. Clifton Knowles
United States Magistrate Judge